Justin Kibbe et al. 24-13986. Mr. Sellers, let everybody else get situated, but I do see you've reserved some time for rebuttal. You may proceed. Thank you, Your Honor. May it please the Court, Matthew Sellers on behalf of the appellants. The District Court erred in construing Markel's abuse exclusion to exclude coverage for the judgment against Ms. Humphrey in this case. It is a basic principle of Georgia insurance law that exclusions from coverage are narrowly construed and construed in favor of coverage. The abuse exclusion is ambiguous at best and therefore should be construed to cover the judgment in this case. I'll explain why that's so and then turn to the other two issues in the case, the breach of the duty to defend and bad faith. There are four interpretive tools that Georgia courts use, all of which point in the direction of ambiguity in the abuse exclusion. That's text, statutes, context, and authority from other jurisdictions. I want to point the Court to what I think are the best two. That would be the Texas abuse exclusion and Markel's own policy and authority from other jurisdictions that struggled to define this term. And Markel's own policy includes a separate endorsement, a Texas professional liability endorsement, which defines abuse as conduct intended to cause harm. That's an indication that that definition is a reasonable one. When there are more than one reasonable definition of a term in an insurance policy, the Court has to select the one that favors coverage. Why should we look to the Texas endorsement when it clearly does not apply in this case? We don't contend that the endorsement applies at all. It's just the endorsement is an indication that a reasonable definition of abuse is conduct intended to cause harm, which is also consistent with the other interpretive tools that we've pointed to. So I understand that the argument you're making today is that the insurance policy we should read abuse to be meaning an intentional act. And you're saying in this case it's very clear she did not intend to break the child's leg. What do we make of the fact that the first complaint filed talks about willful, negligent, and malicious acts of Humphrey? And the second amendment complaint, while their allegations do then trend to the mostly negligent, there is still an intentional infliction of emotional distress claim and a punitive claim, which is suggesting that Ms. Humphrey's behavior was, in fact, intentional. Those are the allegations of the complaint, Your Honor, but the judgment found Ms. Humphrey was negligent and, in fact, rejected any allegation that she acted with intent or expectation to cause harm. And it's the judgment that's what controls here. I mean, it's the judgment that the court should look to when considering the duty to indemnify. So the state court, after a bench trial, found that Ms. Humphrey didn't intend to break the child's leg and acted negligently in doing so. So we disregard what your client, how your client has been referring to the abuse. The guess, the judgment, is what controls. I mean, the court, the state court, rejected the allegation that Ms. Humphrey acted intentionally or with any expectation to harm the child. And under Garden Hire and other Georgia cases, that the judgment is what binds us in the subsequent action. Can I ask you a question? What would have happened if Ms. Humphrey's had representation? Would she have, like, what would her evidence have done? Would it have reduced the amount of damages? Like, what would have happened if she had been given the defense? Certainly. So let me say first that if you construe the abuse exclusion to be ambiguous, then there's just coverage. There's no need to get into the question of how the is evidence from which a jury could conclude that the verdict would have been smaller. Among other things, there was an expert witness who was presented. There's evidence that the testimony from the lawyer who represented Child Care Network, Ms. Humphrey's employer, that that lawyer would have objected to the presentation of that expert evidence. The judgment that the trial court, the state court entered, makes clear that she relied on the expert in reaching a damages verdict. And so there is evidence from which a jury could reasonably conclude the verdict would have been smaller if Ms. Humphrey had had a defense. So you started your answer by saying, then, it doesn't matter. There just would have been coverage. But would, are the, is the family seeking $9 million? Yes, it is. And that's the amount of the judgment. And that's within the Because there was no defense. So two separate arguments, Your Honor. The first is just a duty to indemnify, and that depends on whether the term abuse, as used in the exclusion, is ambiguous. If it is construed in favor of coverage, there is coverage for this judgment. There's a separate question about the duty to defend, and that's, I understand the duty to defend is ordinarily broader than the duty to indemnify. This policy language creates a duty to defend up until the point that an employee of the named insured is adjudicated to be a wrongdoer. And so if the court concludes that there's no duty to indemnify, still there would be a duty to defend. And the reason is because of that policy language. But the timing of this, by the time this civil case was filed, she had already entered a plea, a guilty plea. I get it, under first offender status. Yes, Your Honor. But if we were to disagree with your interpretation of adjudicated as wrongdoer, and if we were to agree with opposing counsel that, in fact, once she pled guilty to the secondary cruelty to children, she had been adjudicated a wrongdoer, that would wipe out the duty to defend because that happened before the civil suit, correct? Only if you first conclude that abuse unambiguously covers her conduct here. If abuse is ambiguous, as we contend, then, constraordinarily, there would be coverage, and you wouldn't need to reach the question of the adjudicated to be a wrongdoer. But if you— Well, walk me—I know that's true, but I continually have trouble getting through the steps in my mind. So walk me through that. Let's say, for purposes of argument, we think abuse was ambiguous and doesn't cover what happened here, then what's the next step? If abuse is ambiguous and doesn't apply to what happened here, reverse and remand for entry of judgment in appellant's favor. Okay. And if it—if we think that it is not ambiguous and does cover negligent, even negligent conduct, right, just straightforwardly, then what's next after that? Then you reach the question of whether she was adjudicated to be a wrongdoer, and we would contend that the first offender plea doesn't meet that definition because, of course, there is no adjudication in a first offender plea until the terms of the first offender sentence are completed. And then if we think, yes, adjudicated to be a wrongdoer, case over, affirm, right? Yes. And if we think, no, not adjudicated to be a wrongdoer, then that means that there was a duty to defend, right? Correct. And then that means what? That means reverse and remand for a trial on what the breach of the duty to defend caused—whether it caused an inflated verdict. Okay. And that would be—and then ultimately the insurance company would be responsible for the delta between what the court determines the verdict would have been versus what the verdict was, yes? That is correct. Okay, thank you. So this could have a potentially dramatically detrimental effect on opposing counsel if we were to agree with you on the definition of abuse, but agree with them on the def—on what it means to be adjudicated as a wrongdoer, because that would mean that they had no duty to defend her, which allowed for the $9 million verdict potentially, and yet they have to cover it because of the definition of abuse, right? I would disagree. I would say if abuse is ambiguous and construed in favor of coverage, then the question of adjudicated to be a wrongdoer falls by the wayside. The duty to defend— Well, right, no, but I think Judge Branch's point is that at least assertedly, assume for this conversation that it's true, that the fact that she had been adjudicated—that they believed that she had been adjudicated as a wrongdoer was absolutely why they did not defend, right? But that would mean that they had no duty to defend, but yet because of the kind of definition of the policy not covering—not actually covering her conduct, then they were—because they couldn't defend, obviously this woman does not have the resources for a lawyer, so of course the verdict gets inflated, right? So at that point, maybe it's their fault for writing the policy that way, but at that point, they didn't have a duty to defend, but ultimately they're responsible for the verdict that resulted from their not defending. I disagree. I think if the abuse exclusion does not apply, then we don't get to the question of whether she'd been adjudicated to be a wrongdoer in that— No, I know we don't get to that. We're not saying anything about that. I'm just saying, assume that factually in the world, the reason that they didn't defend was because they concluded that she had been adjudicated to be a wrongdoer. Doesn't that set up an odd result? And my point is that if the abuse exclusion is ambiguous and doesn't apply, the duty to defend arises irrespective of the adjudication point, and that's because she's still within the bodily injury coverage of the commercial general liability policy. We don't have to look to the abuse exclusion at all. So then the verdict would presumably be corrected based on what would have happened had she been defended? Had they defended, and in that case, of course, the verdict would also have been indemnified because the abuse exclusion wouldn't have been in play. So you don't think that here, as is not ordinarily the case, the duty to defend is potentially more narrow than the duty to indemnify? So I do in the respect that there is a clause that imposes a duty to defend up to the time and ensure it is adjudicated to be a wrongdoer, but that is only the case if the abuse exclusion applies in the first place. If it doesn't, then the duty to indemnify and duty to defend work as it ordinarily would. So what you're saying is they should have looked to see, they should have looked at the policy and seen that abuse was not entirely clear, it wasn't defined, and it was ambiguous. And at that point, if there's a question, then it would have been wiser to defend because if it didn't cover non-intentional conduct, then there was at least a good chance that the policy would apply. Certainly would have been wiser to take that course and not having done so. We have our arguments on bad faith. Those are set out in the brief. Speaking of bad faith, if you're arguing that the abuse exclusion is ambiguous and could be read either in your favor or in Markle's, why would this be bad faith? Because Markle's aware of the very basic principle of insurance law that I began with, which is that exclusions, when there's ambiguity in an insurance policy, it's construed against the carrier and in favor of coverage. And so if Markle was aware of ambiguity, as we contend it was, then its duty was to construe that in favor of coverage, not against it. But the standard for bad faith is that the insurer had no reasonable basis to deny coverage. And if they believe this term that you're arguing is ambiguous was not ambiguous, they're reading it in the way that they have put forth before this court. Why does that support bad faith? I would say that a jury at least could find notice that the carrier had notice of ambiguity. That's the standard in the bad faith cases we've cited, Nisler and others, in our brief. Because, among other things, their own policy defines abuse more narrowly. And at the very least, a jury could conclude based on that that there was awareness of ambiguity in the policy. And that would support a finding of bad faith. It seems kind of like now you've got a federal district court judge agreeing with their interpretation. It's kind of hard for me to envision that when you've got that agreement, that it's bad faith to have pursued that. They prevailed on it with someone. That's true, Your Honor. We think the district court erred by not applying the principle that ambiguities are construed against the carrier. For example, the district court said that Markle has more broadly used dictionaries. I mean, that's not the test. It's not a weighing of who has more authority or which the district court thinks is more persuasive. Ambiguity, if there's two reasonable meanings, is construed against the drafter. The court's decision does reflect the court's view that it was ambiguous, right? I can't remember if he said ambiguous, but if you're spending all that time going through different evidence on both sides and then reaching a conclusion, that suggests that it's at least not certain. What the court said, I think, Your Honor, is that it need not define the outer limits of abuse, and that's precisely the problem, is that if the outer limits of an exclusion are unclear, a reasonable insured is entitled to expect coverage based on a narrower definition. Unless there are other questions, I will return for rebuttal. Thank you. Thank you, Mr. Sellers. Mr. Lange. May it please the Court. Joseph Lange from Carlton Fields for Markle Insurance. Let me pick up right with abuse. We obviously are here to defend the district court's very thorough order that found that the abuse exclusion does apply, and to answer the direct question, found that it was not ambiguous. The analysis by the district court determines that it is not ambiguous, and to answer the question I think you were asking is, how does he do that when he recognizes there may be some definitions in the dictionary that go both ways? How does he do that when— Well, and in Georgia statutes, right? In Georgia statutes, you know, there's one that seems to go one way and one the other. How does the judge determine that that's unambiguous? And this is the way the judge does it, and I think very much correctly, is I think the law has developed in this circuit in particular, that there are many tools that you look at to determine whether something is ambiguous. It's not simply a nose count of dictionaries. It's not simply a nose count of statutes, and as the district court started, and I think very importantly started this way, you look at common sense and context, and this court has very much embraced looking at common sense when you're interpreting an insurance policy. I referenced the ECB case just recently by this court, where clearly there was enough being argued on both sides there that if it was only a nose count as to is there a case that would support the series qualifier canon versus is there a case that would support the last antecedent canon, there clearly were things being argued on both sides that if it was only a nose count like that, we clearly would have had a determination of ambiguity. But this court said, no, just because there may be things you can point to on both sides, that doesn't automatically create an ambiguity. But we're looking, we're as an appellate court, we're looking at this de novo, right? It's not like we're deciding whether it was within his discretion to reach this term. I'm not arguing for his discretion, Your Honor. It is de novo. But I'm arguing this court should look at common sense-wise what abuse means under the policy and should, I mean, I think the Texas endorsement, which my colleague would like to embrace, I would like to embrace, I think that shows that Markell and other insurance companies and other parties know how to limit abuse to intentional conduct when that's what's intended. Because the Texas endorsement does limit it to intentional conduct, which indicates that they know how to do that. But so, I mean, it certainly can have a range of meanings, right? As we see, there are a range of statutory provisions in Georgia, and I suspect elsewhere, that have, you know, different mens rea requirements for different categories of abuse. Why, why doesn't that alone show that it's ambiguous? And if an insurance company wants to limit it to intentional conduct, they need to say so. Or if it wants to include reckless or negligent conduct, they should say that too, because really it could mean any one of those three. I think that if they want to limit it to intentional conduct, they should say that. And they did say that in the Texas endorsement. I think the large bulk of authority indicates that abuse does cover gross negligence, recklessness. And let's be clear, I think everybody's aware of the facts, but we really haven't talked about the facts. And I just want to make sure that we're not talking about a baby rolling off a changing table, an accident where a daycare worker gets distracted by a colleague calling, looks over, baby rolls off the table, which obviously is an accident. This clearly, Markel, to be clear, does not think there was any specific intent here to harm. My colleague has made that clear. We acknowledge, we don't have the perception that there was specific intent on harm here. But without a doubt, there was gross negligence or recklessness here. You know, knowing or should have known that great bodily harm could result, that's a standard much higher than negligence. My colleague seems to draw this dichotomy that you either have negligence or you have specific intent. And there's a big realm in between there. And Gartenheimer doesn't say that the fact that this judgment was entered on the basis of negligence precludes the idea that the conduct was actually grossly negligent or reckless. The complaint itself, as Your Honor recognized, when we get the complaint and have to decide how to apply the policy, what we get is a complaint that talks about malice, maliciousness, willfulness. We get a complaint that says that this particular woman has pleaded guilty to the charge of cruelty in the second degree. I don't think it's that hard to look at that complaint and decide that it falls within the abuse exclusion. That's probably your basis for the bad faith claim. But in the, I mean, you look at the policy and it says there's no coverage for abuse. And then you say, well, what does abuse mean? And where do you look? Well, I mean, I think, first of all, you look at what we know from the complaint that this particular woman has pleaded guilty to cruelty in the second degree under the Georgia statutes. To me, that's a pretty good starting point as to whether you fall within the idea of abuse or not. But I mean, we had to look somewhere because it's not defined. And I mean, are you saying that it's unreasonable for the other side to have referred to the Texas endorsement or to have referred to the Cornell definition or to have referred to, I don't know, they had some other source for a definition, or to have referred to the Georgia statutes? I mean, was that unreasonable for them to do? I think the Texas endorsement doesn't help them. I think it helps us. The fact that there may be outlier definitions, I think clearly the majority of definitions define abuse the way we would define it. So I think one thing we would look at is the dictionary definitions. I mean, so you're disagreeing. Your sources disagree with their sources. I understand. But my point is, it doesn't come down to a nose count to determine ambiguity. It's a much broader analysis. I think we're still sitting here not quite sure what abuse means. Even after all of this briefing, we're all still a little unclear. What did abuse, what did you mean when you said abuse in that policy? And the fact that we're all still debating it really says to me, ambiguity. And then once there's ambiguity, there are so many layers weighing against your client. There is, first of all, there was a motion for summary judgment needed to be viewed in the light most favorable to the insured. It's an exclusion, needs to be viewed in the light most favorable to the insured, or at least construed in favor of the insured. It is an ambiguous term in a policy. And what do you do? You construe it in favor of the, or against the insurer. There's a lot of layers here working against you, where you really need to come out of the box with something that says, abuse means this. Here's the law that says it. And I feel like I'm missing that case or that authority that says, this is what abuse means, or at least abuse does not include or does include negligent conduct. Where does it, I mean, we're missing that. Okay, let me respond. There's a lot there to unpack. First, let me say that if you get to the point of saying it's ambiguous, I agree with you. There's a good amount stacked up against me. But the district court says it was unambiguous. And I think that's correct. And I think there's this feeling that when we look at the word abuse, we need to answer all questions in a black or white, yes or no answer today. And I'm telling you, I don't think that's true at all. And when you look at some of the cases that we cited in our brief and the restatement, these need to be analyzed on a case by case basis. You know, the outer limits of the definition of abuse is. But what I would say is in this case, you're looking at a woman that broke a nine-month-old's femur. And we know how much force that would take to break a femur of a nine-month-old and pleaded guilty to cruelty in the second degree. Negligently, not intentionally. The second degree is criminal negligence. But you are correct. It's not intentional. But I've already said, we're not saying there's specific intent here. But did plead guilty to cruelty in the second degree, which is criminal negligence, after breaking a nine-month-old's leg. I would say that that clearly falls within any definition of abuse. Wherever you might say the outer limit of abuse is, that falls within the definition of abuse. There's no reason to adopt an interpretation that says that it must be intentional conduct. But would it cover, for example, the example that you raised, if she had momentarily turned and the baby fell off the changing table, which is not necessarily gross negligence, I think is what you were suggesting. That's a little lighter. That's like basic negligence. That would be a different case altogether, Your Honor. Why? I thought your abuse definition, your unambiguous abuse definition covered negligence. No, I'm saying that in this case, I'm not saying you need to make that decision as to how far the outer limit of abuse goes. I'm saying that it clearly must go as far as gross negligence, criminal negligence, recklessness, and we definitely have that here. I'm not saying you need to define what the outer limits are, and I would suggest you don't do that, because I think that's a much tougher question. But what happens when the next case comes, and it is just, I mean, the video was submitted, and we're all sitting there watching the other baby sitting in the chair, who like keeps, we're ready for him to like topple over and fall down. Now that's his negligence, and if something happened to him, would that have been covered? Well, I obviously don't want to comment without knowing, but I've seen the video. I was worried about that other baby. I've seen the video, Your Honor, and I appreciate that. I actually watched that for a minute too, and then went back and watched the entire video. But I would say that's clearly just a mere accident, and would not be, this case would not arise if that's what we were talking about. This is a broken femur, and I think it clearly falls within the definition of abuse as a matter of common sense, as a matter of context, and I don't think you need to nose count, you know, how many definitions might go the other way. Clearly, the majority of definitions would capture this conduct, and when Markell wants to limit it to intentional conduct, they do so, as I said in the Texas endorsement. Real quick, I should talk about the duty to defend, because obviously, we think common sense says there was an adjudication of wrongdoing here. The district judge did a very nice job of defining, from Black's dictionary, adjudication and wrongdoing, and putting those together for a definition that I think fits this situation. But more than that, I would point you to, I think it's document 1-4, it's an attachment to the complaint at page 9. It's the actual disposition form from the trial court, and just getting ready for this oral argument, I went back through the record and read these documents. On that form, which is 1-4 at 9, it actually says, final disposition, judgment is entered. And then over on the left, it does have the first offender box mark, but I mean, there's an actual document in the record that says, judgment is entered, final disposition, when they sentenced her to prison. But I would say, just as a matter of common sense, if you go to prison on a 10-year sentence to serve for, she was paroled after 18 months. You only get there with the judge finally disposing of that case. I think it's clearly a final disposition. I would also say that we've- Remind me, did she, in the first offender's context, do you kind of allocute in the same way that a plea bargain, what happened with the plea bargain, or is there a trial? I can't recall how that goes generally, or how it went in her case. I can't tell you everything that went on in the allocution, but she did acknowledge that she did it. I did do it, and she did plead guilty. But we know what the First Offender Act says. We know that now because it's been briefed in this court. I will point out Markell didn't know that when they got the complaint and had to make the decision whether to defend and whether provide coverage. There's no reference to the First Offender Act in any of those documents. But to be fair, I mean, it's a sophisticated company. They don't have to decide within 10 minutes, right? There, I assume, is ordinarily some research that's done to figure out what's going on. Wasn't this at least potentially a snap decision? I don't think snap decision, but I think given what they had in front of them, it was a fairly easy decision. Did they decide not to defend before there was an adjudication? Before, in your mind, there was an adjudication? Before she pled? No. The complaint, the civil complaint came after she had already pleaded and there was an adjudication, which also makes it kind of an odd duty to defend timing situation. Is it your view that adjudication doesn't mean adjudication? I mean, adjudication in the policy doesn't mean technically adjudication because here there was no adjudication. The adjudication was withheld. Well, I think there was the... I do think we don't take a technical definition of adjudication. It's adjudication of wrongdoing. I think we look at final disposition, which there clearly was a final disposition. And if you look at the document I said, that actually looks like there was an adjudication, even though... Just final judgment. I mean, it's a little confusing because maybe you guys need to change the language of your policy to say, you know, a finding of wrongful conduct or a judgment. There was a judgment here, but I don't think there was an adjudication. It's a little confusing. And I am past my time. Can I make two points real quick? Real quick, there's an alternative basis for the duty to defend. That is a finding of legal liability. And we raise that alternative basis. And they say, among other things, my esteemed colleague says, too late. But you can't create coverage through estoppel. That's an age-old law. And we did raise this below in the district court. We're not raising it for the first time on appeal. And then finally, on bad faith, I think that no matter what you do on the first two issues, I think you should affirm on the no bad faith. Because our conduct, I think, was undoubtedly reasonable. And even they are suggesting there would be an issue for the jury. And if there were an issue for the jury, I think the standard itself says, if there's an issue of there's no bad faith. Not letting you go yet. Do you think the abuse question, you know, it seems like a question on one insurance policy, but is this adjudication of guilt? I think that's the term. Is that a common term in policies in your experience in a variety of contexts? I think... Or adjudicated wrongdoing, I guess. Adjudication of wrongdoing, I think, can be found in other policies, not adjudication of guilt. Adjudication of wrongdoing. But I don't think it's uniformly used. But I also am not sure that it's limited to Markell policies. I was just wondering, since Georgia's obviously had a, you know, pretty robust kind of criminal justice reform of the last 10 or 15 years. And I wonder if the state should be the one to decide whether a first offender determination is an adjudication of wrongdoing or not. Do you have thoughts on that? Well, I don't think the state tried to do that. I don't know if you're asking perspectively, would that be a good idea? I'm saying in terms of sometimes we certify questions to the state Supreme Court. Do you think, to the extent that we need to decide that, do you think that would be appropriate? Or do you think it's straightforward enough that we would just decide it? I would be fine if you wanted to certify this over to the Georgia Supreme Court. I think adjudication of wrongdoing is enough different from conviction of guilt or adjudication of guilt that common sense and context. In these circumstances, not every circumstance is going to look like this, but there's a woman that pleaded guilty and went to jail. You don't get in jail unless there's some final disposition that puts you there. And so I think the trial, the district judge appropriately took a step back and looked at what actually happened here and said, that clearly has to be an adjudication of wrongdoing because a woman pleads guilty and ends up in jail. And that you're really counting angels on the head of a pen to say, yeah, but that's not an adjudication. And then when you look, as I say, at the documents in the record, it actually says final disposition and judgment is entered. So there's some basis for the fact that there actually was an adjudication despite what the First Defender Act says. And then I would also point out that all that needs to be shown under that alternative prong to deny duty to defend is, you know, being determined legally liable after an investigation. Well, by the time we get the complaint, there's been an investigation, not just an investigation, but, you know, a conviction. Now, let me take to that. She has been sent to jail on pleading guilty by the time we get the complaint. So I think whatever investigation needed to take place had taken place. And she clearly was legally liable, which is an alternative basis to deny the duty to defend. I would ask you to affirm across the board, but in all events to affirm the bad faith determination. Thank you, Mr. Lang. Mr. Sellers, you have three minutes. Thank you, Your Honor. Let me start with the common sense point. This word, as I think the past half hour has illustrated, abuse is a factory for hypotheticals. Is this abuse? Is it not? And when the line drawing like that is unclear, Georgia law is clear that it has to be construed against the insurer and in favor of coverage. And in this case, there is a definition that would afford coverage, and that's the one that the court has to adopt under Georgia law. That brings me to the crime with which Ms. Humphrey was charged. There was a lot of discussion about what the factual basis for her plea. The elements of that crime, as Judge Damian observed, it's criminal negligence. It's not intent to cause harm. And it's criminal negligence that causes, in the words of the statute, either cruel or excessive pain. Ms. Humphrey was not charged with causing pain cruelly. She was charged with causing excessive pain. There's no indication from the plea that she had any intent to cause any harm to this child. Why wouldn't that fall under any potentially reasonable definition of abuse? I think it's fair to say, and they're not claiming that there was specific intent to hurt the child, but if you're criminally negligent and you're causing excessive pain, you know, why wouldn't that be abuse in terms of this policy? Even if, I think it's fair to say, the policy wouldn't go to just pure negligence, but wouldn't that be, I mean, it obviously is in the criminal sense, criminal negligence or recklessness. Why wouldn't any definition of abuse in this context include those two things? Include recklessness. Or criminal negligence. Criminal negligence in the Georgia law is equivalent to recklessness, but it's negligence that there's a substantial risk of harm. And the way abuse ought to be defined is even more than that. It is cruel. It is conduct that is intended to inflict suffering or harm. And recklessness is not conduct that's intended to inflict suffering or harm. It's conduct that unfortunately does cause harm, but it's not intended to. And on the narrow definition of abuse, which is what Georgia law requires this court to adopt when there's ambiguity in a term, abuse would not cover recklessness. And that brings me back to my hypothetical. So, can you just clarify that process that the district court would go through? Let's say the district court did acknowledge that the term abuse is ambiguous. And we know then that it needs to then construe the term against the insurer. But it's not 100% impossible even doing that for the district court to say, okay, it's ambiguous. I have now gone through all of the canons of statutory interpretation of the text. And I find, based on all of that pile of dictionaries and that pile of sources that the insurer came up with, that even giving the benefit of the doubt to the insured, it includes negligent conduct. He could still do that. I don't remember if it was a he or a she. It was a he, right? Yes, Your Honor. That's not the process, respectfully. Once there's a determination of ambiguity, that's the end of the line. The definition that affords coverage has to be adopted. That is Georgia law. And we would ask for that reason that the court reverse and remand. Thank you both. We have your case under advisement and court is in recess until tomorrow morning.